CITY OF MADISON, Appellant, v. FRANK LLOYD WRIGHT FOUNDATION, Respondent.*

*June 4—June 28, 1963.*

* Motion for rehearing denied, with $25 costs, on October 1, 1963.

366

For the appellant there were briefs and oral argument by *Edwin C. Conrad,* city attorney.

For the respondent there was a brief by *Randolph R. Conners* of Madison, attorney, and *Lewis, Roca, Scoville, Beauchamp & Linton* of Phoenix, Arizona, of counsel, and oral argument by *Mr. Conners.*

WILKIE, J. This is the third time in recent years that the so-called Monona Terrace controversy has been brought to the supreme court. In 1957 the court ruled in *Madison v. State,* 1 Wis. (2d) 252, 83 N. W. (2d) 674, that the city of Madison could constitutionally proceed with the construction of a civic center and auditorium at the Monona Terrace site using Lake Monona frontage filled in as per authority granted by ch. 301, Laws of 1931.

After the so-called Metzner Act was adopted by the 1957 session of the legislature,[2] effectively prohibiting the erection of the civic center and auditorium on that site, the validity of the Metzner Law was challenged in the case of *Frank Lloyd Wright Foundation v. City of Madison and Stewart G. Honeck, Individually and as Attorney General of the State of Wisconsin,* and the case was dismissed as moot by the supreme court because in the meantime the Metzner Law had been expressly repealed in 1959.[3]

---

[2] Ch. 657, Laws of 1957.

[3] Ch. 9, Laws of 1959.

After these several years of controversy and delay, bids were finally requested and rejected (when over two times the original contemplated cost). The Foundation in its demand for arbitration sought to be paid for work done since receiving payment on February 22, 1960, for the preliminary plans. The city (under new administration) countered by starting the present action in late November, 1961.

The city's fundamental position is (1) that the whole contract is invalid; (2) that, even if the contract as a whole is valid, the arbitration clause contemplates common law rather than statutory arbitration, and the city was free to cancel the arbitration clause at any time prior to an award, which it did; (3) that in any event the demand for arbitration was prematurely made by the Foundation; (4) that the Foundation has waived its right to seek arbitration, or by its own breach of contract is barred from seeking arbitration; and (5) the court had no basis for permitting arbitration to go ahead while staying further proceedings in the declaratory-relief action.

The lower court necessarily ruled against the city's position on all five counts in the process of permitting arbitration to proceed and staying further proceedings in the city's action for declaratory relief.

The several pertinent issues that are raised on this appeal are as follows:

I. Is the contract invalid,

(1) Because it contravenes sec. 101.31, Stats.?

(2) Because the city cannot tie itself to an arbitration agreement that (a) calls for arbitration of future disputes; or (b) calls for arbitration of the whole subject matter of the contract and not just particular items?

II. Even if the contract is valid, was the demand for arbitration premature

(1) Because no *bona fide* dispute exists?

(2) Because the Foundation had not made a claim for services rendered against the city in accordance with the requirements of sec. 62.25 (1) (a), Stats.?

(3) Because no specific amount was asked for in the demand?

III. Is the arbitration agreement statutory or is it an agreement at common law, which would permit the city to cancel the arbitration at will at any time before an award is made?

IV. (1) Has the Foundation waived its right to arbitration because it commenced a lawsuit in 1958 in which the city was one of the party defendants which lawsuit was for the purpose of testing the validity of a state law (Metzner Act) which restricted the Foundation in pursuance of the 1956 contract?

(2) Is the Foundation barred from demanding arbitration to determine additional fees because the bid cost of the project exceeded the maximum figure ($5,500,000) allowed in the contract?

V. (1) Did the trial court abuse its discretion in dissolving and in failing to continue the temporary injunction as to arbitration?

(2) Did the trial court have the power to stay the action of the city of Madison for a declaratory judgment until arbitration proceedings under the contract are commenced and resolved?

Issue I. (1) *Is the contract invalid because it contravenes sec. 101.31, Stats.?* The city contends, in effect, that a nonstock, nonprofit organization like the Foundation cannot engage in the practice of architecture in the state of Wisconsin. Sec. 101.31 (7) (a) and (b) provides:

"(7) *Partnership or corporation.* (a) A firm, or a copartnership, or a corporation, or a joint stock association may engage in the practice of architecture or professional engineering in this state only provided such practice is

carried on under the responsible direction of one or more registered architects or professional engineers. Any and all plans, sheets of design and specifications shall carry the signature of the registered architect or registered professional engineer who is in responsible charge.

"(b) No such firm, or copartnership, corporation, or joint stock association shall offer to practice the profession of architecture or the profession of professional engineering in this state, or to use in connection with its name or otherwise assume, use or advertise any title or description tending to convey the impression that it is engaged in the practice of the profession of architecture or the profession of professional engineering, nor shall it advertise to furnish architectural or professional engineering services, unless firm members or copartners owning a majority of the capital interest in such firm or copartnership, or unless the executive director and the holders of the majority of stock of such corporation or joint stock association are duly registered under the provisions of this section."

*Hickey v. Sutton* (1926), 191 Wis. 313, 210 N. W. 704, unequivocally holds that an architect who is not registered in compliance with the statutes cannot recover a fee for any work that he does for another party in pursuance of a contract. In *Fischer v. Landisch* (1931), 203 Wis. 254, 234 N. W. 498, the court stated, at page 256, that the purpose of the statute "is the protection of the public from misrepresentation and deceit, and its prohibition is no broader than is called for by this purpose." The intent of the above-quoted statute obviously is to protect the people of Wisconsin from dealing with one holding himself out to be an architect who is not qualified to do the work.

In *Adams v. Feiges* (1931), 206 Wis. 183, 239 N. W. 446, this court held that a contractor who is not registered as an architect can agree to furnish architectural services as long as he does not hold himself out to be the architect who will perform the architectural services. From this it would follow that as long as the architectural services were

performed by a registered architect, the contractor could recover for the fees due the architect in the performance of his architectural services.

This reasoning was followed by the court in *Lytle v. Godfirnon* (1942), 241 Wis. 533, 6 N. W. (2d) 652, where the court concluded, at page 535:

"If, on the other hand, the evidence shows that plaintiff only agreed to *furnish* architectural services, as in *Adams v. Feiges,* 206 Wis. 183, 239 N. W. 446, and if he handled the business end of the transaction while leaving the architectural part to a registered architect, if the evidence tends to show that the plaintiff acted as a builder and that the plans were actually prepared by a registered architect in the employ of plaintiff, *and that the defendant was sufficiently advised of the relation existing between all concerned,* then the plaintiff would be entitled to recover." (Emphasis added.)

In light of these decisions the city contends that a nonstock, nonprofit organization such as the Foundation can never enter into a contract for architectural services because sec. 101.31 (7) (b), Stats., requires that, "No such . . . corporation, . . . shall offer to practice the profession of architecture . . . unless the executive director and the holders of the majority of stock of such corporation . . . are duly registered under the provisions of this section." The Foundation, it is argued, cannot practice architecture in the state of Wisconsin because the executive director and the majority stockholders are not registered under this section.

We agree with the trial court in its ruling that the statute should not be so narrowly construed as to prohibit a nonprofit, nonstock organization such as the Foundation from entering into a contract for architectural services. In *Adams* and *Lytle* a building contractor was allowed to recover fees for architectural services as long as the architect who did the drawings was registered and as long as the

parties involved were apprised of the relationship between the contracting parties. It is undisputed that Frank Lloyd Wright and his successor, William Wesley Peters, have been registered architects in the state of Wisconsin. Furthermore, the uncontroverted affidavit of Ivan A. Nestingen, who was mayor of the city of Madison at the time that the contract between the Foundation and the city was entered into, unequivocally states that "the whole contract was to obtain the architectural services of Frank Lloyd Wright; that the contract between the City and the Foundation was signed with the Foundation at the request of Frank Lloyd Wright; that the Affiant, "Auditorium Committee and Common Council *were apprised of these facts and discussed them fully in public meetings; . . .*" (Emphasis added.) Mr. Nestingen also swears, "That all during the Affiant's administration there never was any claim made by the Affiant, the Mayor of the City of Madison, or by anyone else in authority that the contract was not valid; . . ."

The city considered the contract in existence from July 5, 1956, through May 10, 1962, at which time, by resolution, it terminated the contract. It would be a serious miscarriage of justice to allow the city at this time to assert the non-validity of the contract.

One further Wisconsin case is pertinent. In *Kempf v. Joint School Dist.* (1959), 6 Wis. (2d) 95, 94 N. W. (2d) 172, the plaintiff tried to collect architect's fees from a school district. He was not a registered architect, but he submitted that he came under the exception granted him by sec. 101.31 (7), Stats., which allowed him to practice architecture because he was a member of a firm which included a registered architect. The lower court allowed the plaintiff to recover but this court reversed. The court held, at page 98:

"The proof does not show that the registered architect is the majority proprietor of the firm. We conclude that the

'firm' lacks the statutory requirements for practicing architecture in providing plans and specifications, nor could the firm's unregistered member, specifically, the plaintiff, then engage in the practice or collect fees for such services."

This case is clearly distinguishable from the case at bar where the principal officers of the Foundation were registered architects and where the city was fully apprised of the Foundation's legal status and of the role of the architects in it.

Issue I. (2) *Is the contract invalid because the city cannot tie itself to an arbitration agreement that (a) calls for arbitration of future disputes; or (b) calls for arbitration of the whole subject matter of the contract and not just particular items?* Although the city concedes that city governments may validly contract to·arbitrate disputes it insists that the disputes must be present disputes, not future disputes, and the arbitration must cover specific items and must not cover the whole subject matter of a contract. .

The annotation at 40 A. L. R. 1370, entitled, "Power of municipal corporation to submit to arbitration," discussed the power of cities to arbitrate and states, at page 1370: "It is well established that a city has the power to submit to arbitration any claim asserted by or against it, whether based on contract or tort, in the absence of a statutory prohibition. This power is based on the right to contract and the right to maintain and defend suits." At page 1372: "It follows that a city has the power, when making a contract, to include a provision for arbitration of future disputes or claims which may arise under it. Such a clause is valid and of the same effect as a similar provision between private parties." There is no statute prohibiting the city of Madison from agreeing to arbitration on an architectural contract such as this.

In *Kane v. Fond du Lac* (1876), 40 Wis. 495, this court held, at page 499:

"That a municipal corporation may, unless restricted by its charter, lawfully submit a disputed claim against it to arbitration, and that the common council of the defendant city had ample power to do so in the present case, we cannot doubt."

In *Joyce v. Sauk County* (1931), 206 Wis. 202, 239 N. W. 439, the court stated, at page 209:

"The general rule is that a city, county, town, or other municipal or quasi-municipal corporation may submit to arbitration any claims asserted by or against it. . . . The cases usually base this right upon the right of the municipal corporations to contract and the right to maintain and defend suits."

This same ruling was earlier adopted in *In re Lower Baraboo River Drainage District* (1929), 199 Wis. 230, 225 N. W. 331, the court holding, at page 240:

"Arbitration should therefore be encouraged rather than discouraged." [4]

The city asserts that arbitration is permitted only as to present disputes, and paragraph 11 contemplates "future disputes." The city argues extensively that under municipal corporation law, one governing body cannot tie the hands of the administration that will succeed it by entering into contracts or passing laws "which would restrict the exercise of discretion by a legislative body with respect to governmental matters entrusted to it." The city cites 42 Op. Atty. Gen. (1953), 97, where the attorney general advised that to do so "is an improper surrender or abdication of legislative

---

[4] The city attempts to distinguish both the *Joyce* and *In re Lower Baraboo Cases, supra,* claiming that the former dealt with a present dispute and the latter dealt with arbitration of only special matters. These distinctions may be valid but the cases still are no authority for insisting that a municipality cannot contract to submit future disputes to arbitration.

power." That opinion was addressed to the state senate in response to an inquiry as to the constitutionality of a bill that would allow a city to "enter into an agreement with a union representing all or a portion of its employes, which said agreement may establish rates of pay and other conditions of employment for a period not to exceed one year."

The city contends that the common council of Madison in existence in 1956 could not contract to submit matters to arbitration arising out of a dispute under said contract, which dispute may arise when another administration is in office.

3 Am. Jur., Arbitration and Award, p. 851, sec. 24, states:

"Within the limits of its charter powers, a municipal or a quasi municipal corporation, unless restricted by positive law, may submit any dispute to arbitration and *may stipulate in its contracts for arbitration of disputes arising thereunder.*" (Emphasis added.)

5 Am. Jur. (2d), Arbitration and Award, p. 570, sec. 68, states:

"Municipal corporations *may also stipulate in contracts for arbitration of disputes arising thereunder.*" (Emphasis added.)

In neither of these sections is any distinction drawn between arbitration of *present* disputes and *future* disputes.

If the city is correct that only present disputes can be arbitrated then there would be no valid agreement to arbitrate disputes that may arise under a contract. In short, there would never be any reason for incorporating an arbitration clause since the only type of dispute that could be arbitrated would be one that already existed at the time the contract was executed. This, of course, would render nugatory the well-established Wisconsin law that cities may agree to arbitrate disputes.

The city relies on 64 C. J. S., Municipal Corporations, p. 1023, sec. 2182, as its authority that only *existing* disputes may be referred to arbitration.[5] It is true that this section does not state explicitly that future disputes may be submitted to arbitration, but neither does it state the opposite.

Three other cases are cited by the city. *Shelby v. Miller* (1902), 114 Wis. 660, 91 N. W. 86, holds that a municipality may not contract with an individual where as a result the officials of the town surrender the performance of their official duties and allow the judgment of others to be substituted for their own. Although this is a well-established rule, this does not mean that a city may not submit a claim to arbitration. Indeed, even the city agrees here that the city may do so.

In *Whitworth College v. Brookhaven* (D. C. Miss. 1958), 161 Fed. Supp. 775, the court stated, at page 782:

"The true test is whether or not the contract in question deprives the governing body or its successors of a discretion which public policy requires should be left to succeeding governing bodies."

The disputed arbitration clause in the instant contract does not deprive the governing body or its successors of a discretion which public policy demands should be left in succeeding governing bodies. The architectural contract specifies the rights and duties of both parties and the arbitration clause provides that *disputes* that arise under that contract are to be arbitrated when they arise. Thus there is no abdication of the governing body's duties over new matters as they may arise in the future but only a present agreement that disputes that may arise under the contract will be arbitrated.

---

[5] Sec. 2182. "ARBITRATION. A municipal corporation, unless prohibited by positive law, generally has power to submit to arbitration claims asserted by or against it."

The city relies most heavily on *Cleveland v. Association* (1945), 30 Ohio Op. 395, holding that the transit board of a municipality which acquired a street-railway system does not, in the absence of a specific grant of power, have the right to enter into an agreement with union employees for compulsory arbitration of disputes arising over wages, hours, or working conditions. That case in turn cited as authority *Wagner v. Milwaukee* (1922), 177 Wis. 410, 188 N. W. 487, which involved a city ordinance requiring skilled laborers employed on work done for the city to be paid the prevailing wage to be determined by that paid to members of any labor organization for such labor. The ordinance in the *Wagner Case* was held void as a surrender by the members of the common council of the exercise of their independent and individual judgment and an agreement to be bound by a scale determined by labor organizations. These cases are also distinguishable from the instant case, since under the disputed contract, arbitration is called for only as to disputes about compliance with the terms of the contract, which terms are fixed by the contract.

The city's final assertion is that it is illegal to have an arbitration clause under which arbitration may be had of disputes involving the whole contract as distinguished from arbitration merely of individual precise questions. The decisions of arbitrators quite frequently include mixed questions of fact and law. The Foundation here demands additional fees. The city raises a host of questions about the performance of the Foundation under the contract, and about the contract. It denies that any fees are due. All of these questions presumably will be examined in detail under arbitration. The fact that the contract requires the submission of disputes to arbitration procedure rather than resorting to normal court litigation is a decision that was within the power of the common council to make.

Issue II. (1) *Even if the contract is valid, was the demand for arbitration premature because no bona fide dispute exists?*

The following facts are undisputed:

1. On February 22, 1960, the city paid the Foundation $122,500 for architect's fees on preliminary plans.

2. On January 30, 1961, the city, through the common council, approved the Foundation's final plans and specifications and authorized a call for bids.

3. On November 14, 1961, the Foundation made a demand for arbitration "for our architect's fees already earned for the completed plans and specifications" on the civic center.

4. On November 27, 1961, the city commenced an action for declaratory relief against the Foundation and in paragraph 20 of its second amended complaint, the city alleges, "That under the terms of the contract, 'Exhibit A,' no further sums have been earned by the defendant [Foundation] and *no sums are now due or payable."* (Emphasis added.)

5. On May 10, 1962, the common council of the city adopted a resolution terminating the contract between the city and the Foundation, claiming a breach of the contract by the Foundation for failing to design the project within the stipulated cost limits.

By its own pleadings and the actions of its governing body, the city denies that it owes the Foundation any further moneys for fees earned by the Foundation. The demand for arbitration by the Foundation, in effect, states that architect's fees are due the Foundation. This clearly creates a *bona fide* dispute between the parties of the exact type contemplated by the arbitration agreement.

In the recent case of *Sonotone Corp. v. Ladd* (1962), 17 Wis. (2d) 580, 117 N. W. (2d) 591, the court held that whether a matter is referable to arbitration is a question to be determined by the trial court after an appropriate hear-

ing. Sec. 298.02, Stats., specifically provides that in order to stay an action the court must be satisfied that the issue involved in the suit is referable to arbitration, so that the court's decision that there is a dispute that should be arbitrated will stand, unless the ruling is incorrect as a matter of law.[6]

Issue II. (2) *Even if the contract is valid, was the demand for arbitration premature because the Foundation had not made a claim for services rendered against the city in accordance with the requirements of sec. 62.25 (1) (a). Stats.?* Sec. 62.25 (1) (a), is as follows:

"62.25 CLAIMS AND ACTIONS. (1) *Claims.* (a) No action shall be maintained against a city upon a claim of any kind until the claimant shall first present his claim to the council and it is disallowed in whole or in part. Failure of

[6] The city cites *Matter of Kramer & Uchitelle, Inc.* (1942), 288 N. Y. 467, 43 N. E. (2d) 493, wherein the New York court stayed arbitration proceedings instituted by the buyer in that case. In that case a seller and buyer entered into four separate contracts for the sale of cloth with a maximum price stated in the contract. The O.P.A. thereafter issued a price schedule which affected this type of cloth and set the maximum price for the cloth at a figure lower than the maximum price stated in the contract. The buyer then demanded the goods at this lower price. When the seller refused his demands, the buyer instituted proceedings for arbitration as set forth in the contract. The seller resisted arbitration and contended that because of the O.P.A. ruling, performance of the contract had been frustrated and that, therefore, the contract was terminated as well as any incidental clause thereof, namely the arbitration clause. The New York court of appeals agreed and stated that since the contract was at an end, so also was the arbitration clause.

This case is clearly distinguishable from the case at bar. In the instant case, the city did not terminate the contract until after the demand for arbitration was made. There was no frustration of performance present as there was in the New York case. And certainly, fees earned for work already performed while the contract was in existence would still be the proper subject of arbitration if there was a dispute as to these fees, and even if the contract had been terminated. (See *Sonotone Corp. v. Ladd, supra,* p. 588.)

the council to pass upon the claim within 90 days after presentation is a disallowance."

The city argues that, even though there may be a valid arbitration clause in the contract of July 5, 1956, in order for that clause to be operative a claim must first be filed with the city as a condition precedent to any arbitration proceeding. The city relies most strongly on the case of *Matter of Board of Education [Heckler Electric Co.]* (1960), 7 N. Y. (2d) 476, 166 N. E. (2d) 666, wherein the New York court said that where there was a dispute between the board of education and the electric company, and the electric company tried to proceed under the arbitration clause of the contract, such clause was inoperative until that time when a claim was made to the board of education because under sec. 3813 of the education law (p. 482), "no action or *special proceeding* may be maintained against a school district or board of education," unless a claim be first filed. (Emphasis added.)

The Wisconsin statute and the New York statute differ in that the New York law includes the words "no action or special proceeding." Sec. 62.25 (1) (a), Wis. Stats., states only that "no action shall be maintained." In *Sauk County v. Baraboo* (1933), 211 Wis. 428, 248 N. W. 418, the court considered sec. 62.25 (1) (a), and held, at page 429:

"There are no exceptions or limitations in that statute. Its language is clear and unambiguous, and includes all claims and demands against a city, without regard to the nature of the claim or the character of the claimant."

But other Wisconsin cases water down the sweeping language of the *Sauk County Case, supra.*

In *Hennington v. Valuch* (1963), 19 Wis. (2d) 260, 120 N. W. (2d) 44, this court stated that the fact that the defendant had not filed a claim against the city did not bar

the defendant from bringing action for contribution against the impleaded municipality.[7]

In *Matter of Board of Education, supra,* it is obvious that the New York court held that a claim for arbitration was considered a *special proceeding.*[8] No such ruling has been made in Wisconsin and sec. 62.25 (1) (a), Stats., refers only to "actions" which obviously refers to suits at law. Thus, in *Hasslinger v. Hartland* (1940), 234 Wis. 201, 290 N. W. 647, there was an action by Carl and Bessie Hasslinger against the village of Hartland. The complaint alleged that the village of Hartland was maintaining a nuisance and demanded its abatement and also damages. No claim was made and the court held, at page 205: "Where the action is for equitable relief (as for abatement of a nuisance by injunction) no claim need be filed under this or statutes having a similar purpose."

We conclude that the fact that no claim was filed against the city under sec. 62.25 (1) (a), Stats., was not fatal to the demand for arbitration.

Issue II. (3) *Even if the contract is valid, was the demand for arbitration premature because no specific amount was asked for in the demand?* This argument is also untenable. The very reason for referring a matter such as the amount of architect's fees to arbitrators is to allow the ar-

---

[7] See also *Geiger v. Calumet County* (1962), 18 Wis. (2d) 151, 118 N. W. (2d) 197; and *Bosin v. Minneapolis, St. P. & S. S. M. R. Co.* (1960), 183 Fed. Supp. 820 (United States district court for the Eastern district of Wisconsin, affirmed on appeal in 297 Fed. (2d) 583).

[8] In *Temple v. Riverland Co.* (Tex. Civ. App. 1921), 228 S. W. 605, the supreme court of Texas held that arbitration was not considered a legal action in the sense of a lawsuit. The trial court in the instant case stated: "Obviously, a mere request to commence arbitration falls far short of the commencement of a legal action against the City. It may well turn out that no award will ever be made by the arbitrators. Should that occur no claim could ever be properly filed with the City Council."

bitrators to determine what amount, if any, is due and owing. The correspondence between the city and the Foundation that is in the record here shows without question that the city would not pay any additional fees and further shows that the Foundation felt it was entitled to additional architect's fees. It would have been futile for the Foundation to state a specific amount. Furthermore, the trial court referred to 6 C. J. S., Arbitration and Award, p. 164, sec. 21, which states as follows:

"A statement of the amount in controversy is not necessary."

Issue III. *Is the arbitration agreement statutory or is it an agreement at common law, which would permit the city to cancel the arbitration at will at any time before an award is made?* The question of whether common law or statutory arbitration is called for by paragraph 11 is probably the most-important issue in the case. This is because of the effect that would follow should there be a determination that this was common-law arbitration. In 3 Am. Jur., Arbitration and Award, p. 899, sec. 70, it is stated:

"GENERALLY.—Generally speaking, at common law it is a well-settled rule that until it is consummated by a valid award, an executory agreement, not made a rule of court, that the substantial rights and liabilities of the parties respecting present or prospective questions in difference shall be determined by arbitrators, will not be enforced by the courts except in an action for breach of the agreement, against a party who revokes or fails or refuses to perform it."

Thus, if the contract calls for common-law arbitration, the Foundation would not be able to have specific performance of the arbitration clause, but would be only entitled to sue for breach of the agreement.

The disputed arbitration clause in the contract reads as follows (clause 11):

"Arbitration of questions in dispute under this agreement shall be submitted to arbitration at the choice of either party in accordance with the provisions then obtaining, of the standard form of Arbitration Procedure of the American Institute of Architects."

The Wisconsin Arbitration Act, enacted in 1931, obviously was intended to make arbitration agreements subject to Wisconsin law specifically enforceable.[9] Thus sec. 298.01, Stats., provides as follows:

"ARBITRATION CLAUSES IN CONTRACTS ENFORCIBLE. A provision in any written contract to settle by arbitration a controversy thereafter arising out of such contract, or out of the refusal to perform the whole or any part thereof, or an agreement in writing between two or more persons to submit to arbitration any controversy existing between them at the time of the agreement to submit, *shall be valid, irrevocable and enforcible save upon such grounds as exist at law or in equity for the revocation of any contract;* provided, however, that the provisions of this chapter shall not apply to contracts between employers and employes, or between employers and associations of employes, except as provided in section 111.10 of the statutes." (Emphasis added.)

The whole purpose of arbitration is to substitute a less-expensive and less-formal method of settling differences between parties for normal court litigation. In arbitration greater use may be made of persons who have a particular expertise that may permit them to adjudicate and settle differences that may exist on highly technical matters.

Every contract that is subject to Wisconsin law and which contains an arbitration agreement, and which does

---

[9] *Depies-Heus Oil Co. v. Sielaff* (1944), 246 Wis. 36, 16 N. W. (2d) 386.

not clearly negate the application of the provisions of the Wisconsin Arbitration Act,[10] incorporates the provisions of that act and those provisions shall apply. Parties entering into a contract that is subject to Wisconsin law and which contains an arbitration agreement, may, as here, prescribe that the arbitration procedure of the American Institute of Architects (or of some other comparable authority) shall apply and the arbitration shall be considered subject to ch. 298, Stats. If one or more of the provisions of the agreed arbitration procedure is in conflict with the provisions of ch. 298, then the provisions of ch. 298 shall apply.[11]

Wisconsin cases cited by the city, holding the arbitration called for in those cases to be common law, are all cases that arose prior to the adoption of ch. 298.[12]

---

[10] Secs. 298.01 through 298.15, Stats. In *Pick Industries, Inc., v. Gebhard-Berghammer, Inc.* (1952), 262 Wis. 498, 56 N. W. (2d) 97, the parties had agreed to arbitration and after an award had been granted, Gebhard-Berghammer, Inc., moved the court to vacate the award and set aside the arbitration agreement. This court held that the arbitration agreement was not regarded as common-law arbitration, but was statutory. The court there stated, at page 504: "Although the agreement to arbitrate,—the submission,—does not refer to the Wisconsin Arbitration Act, ch. 298, Stats., the parties have proceeded in the manner which the act contemplates."

[11] The trial court stated here: "We think that the arbitration procedure selected by the parties and set forth in the rules of the American Institute of Architects will govern *unless* there is a conflict with Chapter 298. In that event the provisions of Chapter 298 will necessarily control." (Emphasis trial court's.)

[12] *Decker v. Ladish-Stoppenback Co.* (1931), 203 Wis. 285, 234 N. W. 355; and *Putterman v. Schmidt* (1932), 209 Wis. 442, 245 N. W. 78. The city quotes from 6 C. J. S., Arbitration and Award, p. 167, sec. 27 b, as follows: "The absence of any words indicating that the proceeding is to be under the statute has been held to lend support to the belief that it is to be at common law, . . ." However, the next sentence states: "When, however, the contract on its face may be regarded as providing for either a statutory arbitration or an arbitration at common law, it has been held that it should be referred to the statute."

The case relied on most heavily by the city to support its contention that the agreed arbitration here was at common law is *Lancaster General Hospital v. Wertz Engineering Co., Inc.,* 56 Lancaster Law Review (1958), 167, which is clearly distinguishable from the instant case. This was a lower court decision by the court of common pleas of Lancaster county, Pennsylvania. The arbitration clause in *Lancaster* was quite similar to the arbitration clause in the case at bar in that it stated, at page 168:

" 'It is mutually agreed that all disputes arising in connection with this contract shall be submitted to arbitration in accordance with the provisions of the current Standard Form of Arbitration Procedure of the American Institute of Architects. . . .' "

But the arbitration agreement also provided " 'and that all findings of fact by the arbitrators under this agreement shall be conclusive and binding on the parties.' "

The Pennsylvania court concluded that this arbitration agreement called for common-law arbitration. Because of the conclusiveness of the arbitrators' findings and conclusions the court refused to vacate the award that had been obtained. In the instant case cancellation was attempted long before an award was entered, in fact even before arbitrators were selected, and there was nothing in the agreement about the conclusiveness of the arbitrators' findings and conclusions, and this is another indication that the parties contemplated a statutory arbitration. (Secs. 298.08 through 298.15, Stats., spell out the procedure to be used once an award is made; the standard form of arbitration procedure of the American Institute of Architects is silent on this procedure.)

We conclude that the arbitration agreement under the contract of July 5, 1956, was statutory and not at common law.

Issue IV. (1) *Has the Foundation waived its right to arbitration because it commenced a lawsuit in 1958 in which the city was one of the party defendants which lawsuit was for the purpose of testing the validity of a state law (Metzner Act) which restricted the Foundation in pursuance of the 1956 contract?* In February, 1958, the Foundation commenced a lawsuit against the city of Madison and Stewart G. Honeck, individually and as attorney general of the state of Wisconsin, the whole purpose of which was to test the validity of the "Metzner Law." [13] That law limited the height of buildings to be erected on the Monona Terrace site of the contemplated civic center and auditorium. The Foundation alleged 11 causes of action, six of which directly attacked the "Metzner Law." The Foundation also alleged that the city breached its contract in that the city had discontinued performance of the contract. In its prayer for relief against the city of Madison, the Foundation asked the court to compel the city to continue its contractual obligations with the Foundation. The city answered on the merits and stated that under the contract the "Metzner Law" presented an insurmountable obstacle to the performance of the contract and that the city was thereby excused from any further performance. The case subsequently came to the supreme court on the question of whether or not Stewart Honeck was a proper party defendant. As previously stated, the appeal was dismissed as moot, since the legislature had subsequently repealed the "Metzner Law." [14]

On this appeal the city claims that the Foundation, by its conduct in that suit, waived its right to arbitrate and therefore cannot demand arbitration under the contract. The city cites Anno. 117 A. L. R. 301, Arbitration Clause—Waiver, to wit, at page 315:

---

[13] See footnote 2, *supra.*
[14] See footnote 3, *supra.*

"It has also been held that a plaintiff, by commencing an action upon a contract containing an arbitration provision, without a proper tender of arbitration, waives the arbitration clause, and cannot successfully assert that the defendant has not the same right in the courts which he demands for himself."

The city also cites a supplementary annotation in 161 A. L. R. 1426, Arbitration—Waiver of. See sec. f, p. 1432.

The position of the city is untenable. The general rule on waiver of arbitration is contained in Anno. 117 A. L. R., *supra*, page 304, to wit:

"As a general rule it may be stated that any conduct of the parties *inconsistent with the notion that they treated the arbitration provision as in effect, or any conduct which might be reasonably construed as showing that they did not intend to avail themselves of such provision,* may amount to a waiver thereof and estop the party charged with such conduct from claiming its benefits." (Emphasis added.)

The lawsuit in 1958 was obviously commenced to test the validity of the Metzner Law. It would have been fruitless for the Foundation to have demanded arbitration to test the validity of the Metzner Law since the contract obviously did not provide or was not intended to cover arbitration of that type of dispute. The action of the Foundation was not "conduct which might be reasonably construed" as showing that the Foundation did not intend to avail itself of the arbitration clause. Furthermore, Anno. 117 A. L. R., supra, page 314, states:

"It has been held that the institution by the plaintiff of a suit on the contract does not constitute a waiver of the arbitration provision thereof, at least if the suit is subsequently dismissed or discontinued by the plaintiff or by the consent of both parties."

The 1958 lawsuit was dismissed because the repeal of the Metzner Law had rendered the subject of that lawsuit moot.

*Quast v. Guetzkow* (1916), 164 Wis. 197, 159 N. W. 810, is in accord with the general rule that commencement of a lawsuit is a waiver of any arbitration clause contained in a contract which is the subject of the lawsuit. However, *Quast* was an action to foreclose a mechanic's lien and only involved the parties to the contract. The 1958 lawsuit by the Foundation involved a party who was not a party to the contract (Honeck).

The city cites five cases in its brief, all of which hold that a party commencing an action waives any arbitration provisions in a contract between the parties; but each of the five cases involved a lawsuit where the parties by their conduct intentionally waived their right to arbitration under the contract, and concerned controversies that were referable to arbitration.[15]

The city also relies on *Bank of Madison v. Graber* (7th Cir. 1946), 158 Fed. (2d) 137, to support its position that commencement of a lawsuit constitutes a waiver of arbitration. The following statement from that case (p. 139) clearly distinguishes that case from the one at bar:

"We agree with Graber that there existed a controversy referable to arbitration under the contract . . ."

The validity of the Metzner Law was clearly a subject that was not referable to arbitration since a party other than the city was involved in the 1958 lawsuit. We therefore conclude that the fact that the Foundation commenced

[15] *Mackof v. Meyer* (1951), 102 N. Y. Supp. (2d) 1008; *La Nacional Platanera v. North American Fruit & Steamship Corp.* (5th Cir. 1936), 84 Fed. (2d) 881; *Almacenes Fernandez, S. A. v. Golodetz* (2d Cir. 1945), 148 Fed. (2d) 625; *Application of Gerakares* (1956), 155 N. Y. Supp. (2d) 771; *Gillette v. Brookhart* (Ohio 1954), 123 N. E. (2d) 693.

the lawsuit in 1958 was no waiver of arbitration by the Foundation.

Issue IV. *(2) Is the Foundation barred from demanding arbitration to determine additional fees because the bid cost of the project exceeded the maximum figure ($5,500,000) allowed in the contract?* Paragraph 1 of the contract between the Foundation and the city provided in part as follows:

"1. Cost of the Work. The project shall be planned and designed so as to not exceed the cost of $4,000,000, plus the cost of parking facilities in the amount of $1,500,000, . . ."

The bids on final plans and specifications were over $12,000,000.

The city claims that the Foundation not only breached its contract by not coming in under the cost figure, but also by failing to revise its plans and specifications to bring that result. The city contends that it could terminate the contract for these reasons and also since the contract itself was invalid. The Foundation has countered with explanations of the cost increase which negate any breach on its part and it also has contested the claim that the contract is invalid. The city's real point is that because of this breach the Foundation cannot proceed to arbitration, especially since the arbitration of its claim for fees will lead the arbitrators into considering the legal questions involved in determining whether the city had the right to terminate the contract. These questions, the city argues, the courts and not the arbitrators should resolve.

Both parties rely on *Matter of Exercycle Corp.* [*Maratta*] (1961), 9 N. Y. (2d) 329, 332, 214 N. Y. Supp. (2d) 353.

In the *Exercycle Case,* Mr. Maratta was employed by the Exercycle Corporation as vice-president in charge of

sales, and his employment was to continue (p. 332), "until he voluntarily leaves the employ of Exercycle or dies." He agreed to accept the employment and "to devote his best efforts and full time" to the corporation. The parties also agreed that, "Any dispute arising out of or in connection with this agreement shall be settled by arbitration in accordance with the rules of the American Arbitration Association." Maratta worked for the corporation until finally it changed management. The new management was dissatisfied with Maratta's contract for lifetime employment. He in turn, and in writing, expressed his dissatisfaction with the management of the corporation. The company treated this writing as a letter of resignation. Maratta sought arbitration. Exercycle stated that the contract was void and unenforceable in that it lacked mutuality since it obligated the corporation to employ Maratta for a definite term, namely, life, but at the same time Maratta was not under any obligation to remain for a definite period, but was free to leave at will. The corporation contended that to allow arbitration would be ousting the courts from their jurisdiction, since the arbitrators and not the courts would be determining a question of law. The New York court disagreed with the corporation's position, and stated that the question as to whether the contract lacked mutuality of obligation "depending as it does primarily on a reading and construction of the agreement, and involving, . . . substantial difficulties of interpretation, is to be determined by the arbitrators, not the court." The court also stated (p. 334), "Once it be ascertained that the parties broadly agreed to arbitrate a dispute 'arising out of or in connection with' the agreement, it is for the arbitrators to decide what the agreement means . . ." The court further stated, "It has long been this State's policy that, where parties enter into an agreement and, in one of its provisions, promise that any dispute arising out of or in connection with it shall be set-

tled by arbitration, any controversy which arises between them and is within the compass of the provision must go to arbitration." The court recited four situations where the court will enjoin arbitration: (1) Where fraud or duress renders the agreement voidable; (2) where there is no *bona fide* dispute; (3) where the performance which is the subject of the demand for arbitration is prohibited by statute; and (4) where a condition precedent to arbitration has not been fulfilled. The court concluded by stating, at page 336:

"If the issue involved was solely one of construction or interpretation, it would, without a doubt, be for the arbitrators to decide. The mere fact that its determination involves a mixed question of the agreement's meaning and of law should not lead to a different result. Whether the issue is one involving interpretation or law or fact or all three, it is for the arbitrators and, as long as they remain within their jurisdiction and do not reach an irrational result, they may fashion the law to fit the facts before them." [16]

We consider that the *Exercycle Case* supports the conclusion that the demand for arbitration and the related issues presented by the declaratory-relief action frame a dispute which, properly, should be settled by arbitration.

Although the city claims here that the Foundation has breached the contract, the Foundation claims that it has not and that it is entitled to additional architectural fees. The

[16] 3 Am. Jur., Arbitration and Award, p. 841, sec. 11, states: "Questions of law as well as of facts may be arbitrated, regardless of their difficult character, including the construction of the arbitration agreement itself, . . ."

5 Am. Jur. (2d) Arbitration and Award, p. 563, sec. 58, concurs as does 6A Corbin, Contracts, p. 410, sec. 1437, where he states: "Questions of law and questions of fact are generally intermingled and inseparable." He further states: "The fact that the dispute submitted requires the determination of private rights and legal interests does not invalidate either the submission agreement or the arbitrator's award."

affidavit of William Wesley Peters, in support of the Foundation's application for a stay of action, states that building costs rose from 21.3 percent between March, 1955, and March, 1960; that the city of Madison had requested changes from the original plans, namely an auditorium to seat 2,400 people instead of 2,000, a larger floor in the exhibition hall than was originally called for in the contract, seating in the exhibition hall for 3,800 instead of 3,500, seating capacity of 460 persons in the "little theatre" instead of the 300 initially called for, 13,731 square feet of art-exhibition area instead of the original 3,000 square feet, a parking area to provide for 840 to 940 cars instead of the original 750 cars, and 19 committee rooms occupying 19,000 square feet instead of the original 15,000 square feet. It is very apparent that there is a very real dispute arising out of the contract which, under the ruling of the *Exercycle Case, supra,* would properly be the subject for arbitration proceedings.

It is not fatal that the arbitration process here will lead to a consideration of mixed questions of law and fact. On the contrary, this is to be expected and is entirely consistent with the basic purpose of arbitration proceedings as a substitute for normal litigation.

Issue V. (1) *Did the trial court abuse its discretion in dissolving and in failing to continue the temporary injunction as to arbitration? Mogen David Wine Corp. v. Borenstein* (1954), 267 Wis. 503, 66 N. W. (2d) 157, holds that a trial court has a great deal of discretion in making such a determination. It is obvious that the trial court concluded that there was an issue presented in the case at bar which was referable to arbitration. The city of Madison had asked for a temporary injunction restraining the Foundation from proceeding with arbitration. The trial court granted such a temporary injunction until further order of the court. The trial court later determined that the parties

should proceed with arbitration and dissolved the temporary restraining order. If the trial court's conclusion as to arbitration was correct, it clearly did not abuse its discretion in dissolving the temporary injunction.

Issue V. (2) *Did the trial court have the power to stay the action of the city of Madison for a declaratory judgment until arbitration proceedings under the contract are commenced and resolved?* Sec. 298.02, Stats., is entitled "Stay of Action to Permit Arbitration" and provides in part as follows:

"If any suit or proceeding be brought upon any issue referable to arbitration . . . the court in which such suit is pending, . . . shall . . . stay the trial of the action until such arbitration has been had . . ."

The city argues that the trial court did not have the power here to stay the proceedings because (1) the city's action was for a declaratory judgment, and a declaratory judgment is in no sense of the word a suit or proceeding as contemplated by sec. 298.02, Stats.; and (2) the power of the trial court under sec. 298.02 is to stay the "trial" of an action and not all preliminary proceedings, such as pleadings, as may be involved in a declaratory-relief suit.

The city's first contention is answered by the very language of sec. 298.02, Stats., which allows a stay, "If any suit or proceedings be brought . . ." This includes an action for declaratory relief. To hold otherwise would permit any party to defeat an arbitration clause by instituting a declaratory-relief action. This would be diametrically opposed to the purpose of sec. 298.02. We reject the city's first contention.

As to the city's second contention, it would have been better procedure for the Foundation to file an answer or plea in abatement.[17] If this had been the procedure there

---

[17] In *Sonotone Corp. v. Ladd, supra,* we held that the plea in abatement was in effect an answer.

could be no quarrel with a stay of further proceedings since the pleadings would have clearly framed the issues contemplated under the language of sec. 298.02, Stats. In the instant case we consider the motion for a stay as filed by the Foundation sufficient to raise the question of whether an issue or issues were presented in the declaratory-relief action that were properly subject to arbitration. Under the circumstances, we conclude that a reasonable construction of sec. 298.02 allowed the trial court to stay all further proceedings once it is determined that an issue in the action is referable to arbitration, and even though a formal answer was not filed by the Foundation. We therefore reject the city's second contention.

*By the Court.*—Orders dated November 23, 1962, and December 28, 1962, affirmed, and cause remanded for further proceedings not inconsistent with this opinion.